**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| BENJAMIN PLESHA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:05-CV-201 PS |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Benjamin Plesha was fired by United States Steel for excessive absenteeism and while the appeal from his dismissal was pending he requested leave under the Family and Medical Leave Act. The request for FMLA leave was never acted upon by U.S. Steel and Plesha was eventually fired about a month later when he skipped out of work early without permission. Plesha claims that U.S. Steel violated the FMLA, and U.S. Steel has moved for summary judgment. [Docket No. 20.] Because Plesha has not demonstrated that he had a serious health condition entitling him to leave under the FMLA, U.S. Steel's motion is granted.

## I. BACKGROUND

Plesha worked at U.S. Steel's East Chicago Tin Mill (known as the "Gary Works") from June 2000 until he was discharged on or about December 2, 2004. (Def.'s Ex. 4 [Docket No. 21].) At the time of his discharge, Plesha was working as a Coiler, operating a machine that winds metal sheets into coils as the sheets proceed through a mill. (Def.'s Ex. 1 at 18.)

Plesha had a history of attendance problems dating back to at least 2003. He was suspended three times in 2003 and once in June 2004 for undocumented or unreported absences.

1

(Def.'s Ex. 4.)  U.S. Steel's absentee reports indicate that Plesha took, by the Court's count, 44 full days off in 2004, not including vacation.  (Pl.'s Ex. 2 [Docket No. 29].)  Twenty-nine of those absences were for "personal illness";  five were days that Plesha did not report off or was not given permission to take off;  four were "personal" days;  four were for an "illness in family";  and two absences were "off work with permission."  (*Id.*)  Plesha also had an additional 25 incidences of partially completed shifts, during which he either left early with or without permission, was tardy, or, in one incident, was sent home for disciplinary reasons.  (*Id.*)

U.S. Steel's medical department was aware that Plesha was diagnosed with depression and anxiety disorder in 2003, though Plesha's managers or supervisors were unaware of this particular diagnosis, a point that Plesha does not dispute.  (Pl.'s Ex. 1.)  More recently, in the summer of 2004, Dr. Fernando Rivera, a family practitioner, diagnosed Plesha with "depressive neurosis" and "anxiety."  (Def.'s Ex. 16.)  However, the record does not indicate that Plesha provided U.S. Steel with notice of those particular diagnoses at any point prior to October 2004. Plesha was able to go about life, work, and perform daily functions on his own without assistance.  (Def.'s Ex. 1 at 120.)  However, Plesha also testified that sometimes anxiety strikes him for "two, three weeks at a time" and disrupts his regular functions.  (Def.'s Ex. 2 at 235-36.)

Plesha's absenteeism came to a head in October 2004; he called in sick on October 23, 2004, a Saturday.  (Def.'s Ex. 9.)  When he returned to work the following Tuesday, October 26, he provided a doctor's note dated Monday, October 25.  (*Id.*)  His supervisors then called a meeting and asked him to explain his absences.  (Def.'s Ex. 1 at 78.)  At this time, Plesha

identified his conditions of depression, depressive neurosis, anxiety, and costochondritis.[1]  (*Id.*)

His supervisors found that the October 23 absence was unjustified, and issued Plesha a five-day

suspension.  (Def.'s Ex. 9.)  When a hearing on the matter was held on October 29, Plesha

admitted that his regular doctor was open on Saturday, but that he waited to go to a different

doctor on Monday.[2]  (*Id.*)  Following the hearing, the suspension was converted to discharge

with "Justice & Dignity" – a provision in the company's collective bargaining agreement that

allows employees to keep working while they wait to exhaust their remedies under the

agreement.  (Def.'s Ex. 11.)

Within days of his discharge (which was in abeyance pending his appeal), Plaintiff

picked up FMLA forms from U.S. Steel's employment office.  (Def.'s Ex. 1 at 76.)  There are

two parts to the form: a cover page to be completed by the employee and a health care

certification to be completed by a doctor.  Plesha only partially filled out his part of the form,

and the part he did complete is inconsistent with the health care certification.  On the one hand,

Plesha requested "intermittent leave."  (Def.'s Ex 5 at 1.)  On the other hand, Plesha's physician,

Dr. Rivera, stated in the form that it was not necessary for Plesha to work intermittently.  (*Id.* at

Question # 5b.)  Plesha also failed to check the box indicating that the leave would be for his

---

[1] According to the National Library of Medicine, costochondritis is "an inflammation of a rib or the cartilage connecting a rib.  This is a common cause of chest wall pain." http://www.nlm.nih.gov/medlineplus/ency/article/000164.htm.  According to information published by the Mayo Clinic, "[m]ost cases of costochondritis have no apparent cause, and most go away on their own."  http://www.mayoclinic.com/health/costochondritis/DS00626 .

[2] Although the union stated in its grievance report that Plesha did not go to his regular doctor, Dr. Rivera, because he was in the process of switching doctors (Def.'s Ex. 9), this is contradicted by the fact that Plesha apparently went to see Dr. Rivera in early November 2004 to have the FMLA form completed (Def.'s Ex. 1 at 80), and visited him two other times in the month of November (Def.'s Ex. 19).

own medical condition (as opposed to leave for care of someone in his family).  (*Id*. at 1.)

Dr. Rivera partially completed the Certification of Health Care Provider form (Form WH-380) on November 4, 2004.  (Def.'s Ex. 5.)  Curiously, though, Plesha's medical records do not disclose a visit to Rivera's office on that date.  (Def.'s Ex. 19.)  Dr. Rivera certified that Plaintiff had a "serious health condition," checking the box indicating that Plaintiff's condition requires "Absence Plus Treatment" (a term whose explanation on Form WH-380 matches the category of "continuing treatment" described in 29 C.F.R. § 825.114(a)(2)(i)).  (Def.'s Ex. 5.)  Rivera described Plesha's condition as "Anxiety states.  Chest pain secondary to costo-chondritis."  (*Id*.)  Where asked to state the approximate date the condition commenced, the probable duration of the condition, and if different, the probable duration of the patient's present incapacity, Dr. Rivera simply wrote "Commenced 7/2004."  (*Id*.)  He did not state the duration of the illness.  (*Id*.)  As mentioned above, in response to the question "Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in Item 6 below)?" Dr. Rivera answered "No."  (*Id*.)  Rivera stated that Plesha's treatment regimen consisted of prescription drugs.  (*Id*.)  The form also asked whether, in the event medical leave is required for the employee's absence from work for his own health condition, the employee would be unable to perform work of any kind; Rivera answered this question "Yes."  (*Id*.)

Plesha turned in the form to the employment office on November 11 or 12, 2004.  Christiana Johnston, the staffing and benefits manager for the Gary Works, testified that FMLA forms are normally processed within a week.  (Pl.'s Ex. 3 at 12.)  She stated, however, that when she reviewed Plesha's form and took it over to the medical department to review it with Dr.

Tokowitz, the plant doctor, he was on vacation.  (*Id*. at 12.)  She was unable to meet with the doctor the following week, which was the week of Thanksgiving.  (*Id*. at 14.)  And when she got back to reviewing FMLA documents with the doctor, she observed that Plesha had been terminated in October but had an appeal pending, so she decided to wait until the appeal process was resolved before moving forward with the FMLA request.  (*Id*. at 13.)  She did, however, talk to Dr. Tokowitz about the form; he stated that the leave probably would not be approved because of the format of Plesha's FMLA papers, but that he would have to make a physical examination in order to make a final determination.  (*Id*. at 15.)  Apparently, that evaluation was never made because Plesha was discharged on or about December 2, 2004, before it could take place.  (*Id*.)

While the appeal of his termination from the October incident was pending, Plesha worked two full weeks in November before missing seven consecutive days from November 14 through November 20.  (Def.'s Ex. 6.)  On November 14, he changed his shift with permission; on the 15th through the 20th, he took off for "personal illness."  (Pl.'s Ex. 2.)  Plesha saw Dr. Rivera on November 15 with symptoms of headache, chest pain, and difficulty breathing. (Def.'s Ex. 19.)  Rivera wrote "BTW=11/17/04," which Plesha admitted stood for "back to work" on November 17, 2004.

Plesha then went to a Dr. Korman on November 17, 2004 and received a note indicating that he would return to work the following day, November 18.  (Def.'s Ex. 14.)  He went back to Dr. Rivera on November 18, and received a note indicating that he would be able to return to work on November 22.  (Def.'s Ex. 7.)  Plesha had an echocardiogram on November 22; that test "revealed normal left ventricular size with good overall systolic function," and was otherwise "unremarkable."  (Def.'s Ex. 10.)  Plesha worked on November 23 and 24.  (Def's  Ex. 6.)  On

November 25, Thanksgiving Day, he was "off work with permission," and he was absent for "personal illness" again on November 26 and 27.  (Pl.'s Ex. 2.)  He went to the Hammond Clinic on November 26 with complaints of chest pain; the clinic's notes indicate that Plesha would return to work on November 28.  (Def.'s Ex. 18.)  At deposition, Plaintiff consistently could not recall what his symptoms were on the days he called in sick in November, or whether they prevented him from performing basic daily tasks.

Plesha returned to work on November 28, and worked his full 6:00 a.m. to 2:00 p.m. shift.  He was nearing the end of his shift when he was told by a shift manager that he would have to work overtime.  (Def.'s Ex. 21 at 22-23.)  U.S. Steel's labor agreement envisions that employees may be required to work more than eight hours on a given day (Def.'s Ex. 20), and Plesha admits that he had been required to do so in the past (Def.'s Ex. 1 at 22).  After working another 40 minutes or so, Plesha began feeling sick.  Around 3:15, he told his foreman, Ronda Waters, that he was not feeling well and wanted to go to the plant's medical clinic.  (Def.'s Ex. 1 at 27.)

Plesha was taken to the clinic, where he told the nurse practitioner, Marsha Durbin, that he felt nauseous and extremely tired.  (Def.'s Ex. 1 at 32.)  He testified that he told Durbin that he had been suffering from anxiety, was under medical care, and had recently turned in an FMLA request.  (*Id.*)  Plesha said he was nauseous, so she offered him Maalox, her standard course of treatment for someone who presents with nausea.  (Def.'s Ex. 12 at 17.)  Plesha then stated that he was "too tired" to work overtime, but did not mention anxiety or depression.  (*Id.* at 39; Def.'s Ex. 3.)  Durbin conducted a brief physical exam, but reported that Plesha was not suffering any acute distress and had no objective symptoms.  (Def.'s Ex. 12 at 19-21.)  When

6

Plesha returned to his job site and gave Waters his form from the medical clinic, Waters told him that if he left, he would be discharged for insubordination.  (Def.'s Ex. 1 at 36.)  Plesha then mentioned that he had turned in an FMLA form.  (*Id*. at 37.)  Plesha did not mention the FMLA form to any of his supervisors between November 12, when he handed the form in, and this November 28 conversation with Waters.  (*Id*. at 88.)  Plesha decided to go home, and called his wife to come pick him up because his own car was not working.  (*Id*. at 38, 48.)  She picked him up around 5:00 p.m.  Plesha did not seek treatment from anyone on November 28.  (Def.'s Ex. 15.)

After getting home, Plesha slept most of the night but eventually decided he wanted to come back to work the next day;  he called his union griever, who advised him to do so.  (Def.'s Ex. 1 at 44.)  The next morning, Plesha arrived at work and, after some effort, he was allowed to return to the plant, where he worked a double shift.  (*Id*. at 47-52.)  There was no part of the job that day that he could not perform, though Plesha claims he was "barely" able.  (*Id*. at 58.)  Plesha was given a five-day suspension for the refusal to work.  However, after a hearing on December 1, the suspension was converted to a discharge.  (Def.'s Ex. 4.)  After the hearing, Plesha filed a grievance with his union.  (*Id*.)  Although the union pursued Plesha's claim through two levels of appeals, it ultimately withdrew the grievance at the third stage.  (*Id*.; Def.'s Ex. 21.)  A union representative, Alexander Jacque, testified that Plesha failed to bring in the supporting documentation necessary to substantiate his November 28 refusal to work overtime.  (Def.'s Ex. 11 at 12, 20, 33-34.)  The union also withdrew the grievance for the October 23 absence after step 2 of the grievance procedures (Def.'s Ex. 21), meaning that U.S. Steel had two reasons for terminating Plesha – one that occurred prior to Plesha's resort to the FMLA, and one

7

after.

## II.  DISCUSSION

A party is entitled to summary judgment when, viewing the pleadings and record evidence in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 705-06 (7th Cir. 2006).  The party seeking summary judgment has the initial burden to demonstrate an absence of evidence to support the position of the non-moving party.  *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby*, 447 U.S. 242, 252 (1986).  A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

### A.      Retaliatory Discharge Claim

Plesha argues in his opposition to summary judgment that he was "wrongfully discharged in violation" of the FMLA.  (Pl.'s Opp. at 5 [Docket No. 28.].)  He does not cite the specific provision of the FMLA he alleges was violated, and while his complaint clearly alleges that the wrongful discharge was a result of U.S. Steel's failure to afford him his substantive rights under the FMLA (a violation of 29 U.S.C. § 2615(a)(1)), it is not clear whether Plesha also intends to state a claim of retaliatory discharge under 29 U.S.C. §§ 2615(a)(2) or (b).  The complaint simply alleges that "Plaintiff was not given 12 weeks of unpaid leave to care for his serious health condition prior to his termination," and that Defendant "violated Plaintiff's [FMLA] rights

by terminating Plaintiff with out [sic] giving him 12 weeks of unpaid leave." (Compl. at 2 [Docket No. 1].) Because Plesha has not alleged that his termination was motivated by his opposition to "any practice made unlawful" by the FMLA, see 29 U.S.C. § 2615(a)(2), or by his participation in proceedings related to his FMLA rights, see 29 U.S.C. § 2615(b), Plesha is precluded from alleging retaliatory discharge to the extent he attempts to do so in his summary judgment opposition. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

In any event, Plesha has not adduced any facts in support of a retaliation theory. Plaintiff either had to produce direct or indirect evidence of discrimination sufficient to reflect a genuine issue of material fact, or he had to resort to the familiar burden-shifting method established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973). *See King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). Plesha has not introduced any direct or indirect evidence of discrimination. Nor has he demonstrated that his termination was causally related to his request for FMLA leave. In addition, there is no evidence of pretext here. U.S. Steel terminated Plesha because of his repeated failure to abide by the company's attendance policy and his insubordination. Plesha could hardly show pretext since U.S. Steel terminated Plesha the first time (pending his appeal rights) *before* he turned in his FMLA forms.

### B.    Substantive FMLA Claim

Plesha also alleges that U.S. Steel violated his substantive FMLA rights under 29 U.S.C. § 2615(a). A plaintiff raising an FMLA claim must prove that he is entitled to a right under the

9

FMLA and has been denied it.  The employer's intent is immaterial.  *See King*, 166 F.3d at 891

(citing *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997)).  Additionally, a

plaintiff must show not only that his employer violated a provision of the FMLA, but that he was

prejudiced by it.  *See Ragsdale v. World Wide Wolverine*, 535 U.S. 81, 91 (2002) ("To determine

whether damages and equitable relief are appropriate under the FMLA, the judge or jury must

ask what steps the employee would have taken had circumstances been different."); *Harrell v.*

*U.S. Postal Serv.*, 445 F.3d 913, 928-29 (7th Cir. 2006) (holding that plaintiff was not entitled to

a remedy where he could not show that he was harmed by his employer's unauthorized contact

with his physician).  An employee who takes FMLA leave is not entitled to any greater rights or

privileges than other employees who have not taken FMLA leave.  *See* 29 U.S.C. §

2614(a)(3)(B).

### 1.  Defendant's violation of FMLA notice provisions

Under FMLA regulations, once an employee requests leave under the Act, the employer

must provide written notice back to the employee "detailing the specific expectations and

obligations of the employee and explaining any consequences of a failure to meet these

obligations."  29 C.F.R. § 825.301(b)(1).  The notice from the employer should be provided

within a reasonable time – within one or two business days if feasible.  29 C.F.R. § 825.301(c).

An employer is entitled to request a medical certification that the employee has a serious

health condition that makes him unable to perform the essential functions of his position.  29

C.F.R. § 825.305(a).   If the employer finds that a certification is incomplete, it must advise the

employee and provide him a "reasonable opportunity to cure any such deficiency."  29 C.F.R. §

825.305(d).  If an employer doubts the validity of the medical certification, the FMLA provides

procedures for obtaining a second, and sometimes a third, opinion.  29 U.S.C. § 2613(c)-(d).

U.S. Steel has admitted that it did not fulfill all its notice obligations under the FMLA.  It admits that it "did not provide written notice . . . to Benjamin Plesha within a reasonable time after U.S. Steel was in receipt of Benjamin Plesha's completed WH-380 form and/or a certification by heath care provider form."  (Pl.'s Ex. 1 at 2.)  And it admits that it "never provided an employer response to Benjamin Plesha's request for family or medical leave."  (*Id.* at 1.)  Thus, Plesha has shown that U.S. Steel violated the notice provisions of the FMLA, and these provisions are mandatory.  *See* 29 C.F.R. § 825.301(b) ("The employer *shall* also provide the employee with written notice detailing the specific expectations and obligations of the employee  . . ." (emphasis added)); 29 C.F.R. § 825.305(d) ("The employer *shall* advise an employee whenever the employer finds a certification incomplete." (emphasis added)).

The question is whether U.S. Steel's disregard of the FMLA notice requirements has any upshot under the facts of this case.  In other words, if Plesha cannot show that he has a serious health condition, then U.S. Steel's notice violations may be beside the point. Plesha argues that U.S. Steel should not be allowed to now claim that Plesha did not have a serious health condition, because it failed to do so contemporaneously with the FMLA request.  (Opp. at 15-16 ("It is unconscionable that Defendants have ignored all of their statutory requirements in this case and then want to use Mr. Plesha's ignorance of the FMLA statutes in their favor.").  In essence, Plesha contends that U.S. Steel should be estopped from challenging Plesha's "serious health condition" by its failure to properly notify him of his FMLA rights and obligations.

But an employer does not waive its ability to challenge the seriousness of the employee's illness by not following the medical certification procedures of the FMLA.  *See Rhoads v.*

11

*F.D.I.C.*, 257 F.3d 373, 384 (4th Cir. 2001) (citation omitted) (holding that it was proper to require plaintiff "to prove that she was afflicted with an FMLA-qualifying condition, because otherwise she did not have any right under the Act with which her employer could have interfered"). Thus, even if U.S. Steel disregarded its notice duties, Plesha must still demonstrate that he was entitled to leave under the Act. *See Diaz*, 131 F.3d at 713 (holding that substantive FMLA suits are to be resolved "by asking whether the plaintiff has established by a preponderance of the evidence that he is entitled to the benefit he claims").

It is true that some courts have held that an employer may be estopped from challenging an initial certification that establishes an employee's serious health condition. *See, e.g., Smith v. Univ. of Chicago Hosps.*, 2003 WL 22757754, at *8-9 (N.D. Ill. Nov. 20, 2003); *Miller v. AT&T*, 60 F. Supp. 2d 574, 580 (S.D. W.Va. 1999), *aff'd*, 250 F.3d 820, 839 (4th Cir. 2001), *Sims v. Alameda-Contra Costa Transit Dist.*, 2 F. Supp. 2d 1253, 1263 (N.D. Cal. 1998). But in these cases, the courts emphasized that the original certifications were "sufficient" under the standards of 29 U.S.C. § 2613(b) to establish the existence of a serious health condition. *Smith*, 2003 WL 22757754, at *9; *Miller*, 60 F. Supp. 2d at 580 ("[U]pon the submission of a sufficient medical certification, an employee is entitled to 'FMLA protection unless and until there is contrary medical evidence.'") (citation omitted); *Sims*, 2 F. Supp. 2d at 1263 (defendant "waived its right to litigate whether [plaintiff] had a serious health condition only if [plaintiff's] initial certification was sufficient to establish that he had such a condition"). We must therefore determine whether Plesha's original certification established a serious health condition.

### 2. Plaintiff's "serious health condition"

An employee's leave is FMLA-qualifying if "(1) it is the result of a 'serious health

condition' that (2) 'makes the employee unable to perform the functions' of his job.  If either of these elements is not met, the employee is not entitled to FMLA leave."  *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 313 (7th Cir. 1998) (citing 29 U.S.C. § 2612(a)(1)(D)).

In his complaint and summary judgment opposition, Plaintiff repeatedly asserts that he has a "serious health condition" without explaining how his illness qualifies as such under the framework of the FMLA.  *Haefling v.  United Parcel Serv., Inc.*, 169 F.3d 494, 499 (7th Cir. 1999) ("Whether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that the employee may not sidestep in the context of summary judgment merely by alleging his condition to be so." ).  To establish a "serious health condition" a Plaintiff must prove that either (1) he was placed in inpatient care, or (2) that he has received "continuing treatment by a health care provider" for his illness or condition.  29 C.F.R. § 825.114(a)(1)-(2). The former category obviously does not apply here because Plaintiff was not placed in inpatient care.

As for the second category, the FMLA regulations establish a number of examples of what qualifies as "continuing treatment."  Here, Dr. Rivera checked the box on the medical certification for "absence plus treatment," which is defined as follows:

> A period of incapacity (*i.e.*, inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves: (A) Treatment two or more times by a health care provider. . . ; or (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.l14(a)(2)(i).  Plaintiff does not urge any other classification of his incapacity.

The certification (Def.'s Ex 5) completed by Dr. Rivera is the only medical evidence that

Plesha has presented to the Court to prove that "anxiety" and "costochondritis" rise to the level of a serious health condition.  A certification is sufficient if it provides the date the serious health condition began, its probable duration, relevant medical facts, and a statement that the employee is unable to work.  29 U.S.C. § 2613(b); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 886 (7th Cir. 2005).  But here, the certification is insufficient to establish that Plaintiff had a serious health condition on October 23 or November 28, the dates of the incidents that prompted his termination.

First, the certification does not substantiate that Plesha needed FMLA leave on October 23 or November 28.  In reviewing the November 4 certification, it is simply unclear what Dr. Rivera was certifying. The certification indicates that Plesha's condition – "anxiety states" and "costo-chondritis" – required an absence of more than three days and at least two doctor's visits or a single doctor's visit that resulted in a regimen of continuing treatment.  Where the form asked whether the condition would render the employee totally unable to work, Dr. Rivera wrote "Yes."  And while the portion of the form completed by Plesha states that he seeks intermittent leave, Dr. Rivera explicitly stated that it would not be necessary for him to work intermittently or on a reduced schedule.  (Def.'s Ex. 5, Question 5b.)  Under the line asking for the date the condition commenced and its duration, Rivera simply wrote "Commenced 7/2004."

The certification cannot sensibly be read retrospectively to cover Plesha's October 23 absence.  Plesha did not even inform his supervisors about his conditions until he was already in hot water over that absence, and he waited nearly three weeks after that absence to turn in his FMLA form.  In any event, even if Dr. Rivera had intended to certify Plesha's FMLA eligibility retroactively, the certification would not cover October 23.  Rivera completed an unrelated

14

benefits form indicating that Plesha was diagnosed on July 23, 2004 (Def.'s Ex. 16 at 3), which

Rivera's records confirm was the last date that Plesha saw him in July (Def.'s Ex. 19 at 7).  As

discussed above, Rivera clearly stated that Plesha did not need to work intermittently.  And even

if Rivera had intended to certify Plesha for a full twelve weeks, the FMLA maximum, starting on

the date the condition commenced, those twelve weeks would have expired on October 15, a

week before Plesha's October 23 absence.[3]  In short, Plaintiff offers no interpretation of the

certification that would cover the October 23 absence for which he was terminated.

Nor can the certification be read prospectively to substantiate Plesha's decision to walk

off the job on November 28.  The certification was signed on November 4 and turned in on

November 11 or 12.  But Dr. Rivera could not have intended to certify that Plaintiff's serious

health condition extended all the way until November 28, because Plaintiff saw Rivera twice

between his visit on the 4th and the incident on the 28th, and twice Rivera approved Plaintiff's

return to work.  On November 15, Plaintiff saw Rivera for chest pain and headache, and Rivera

made a notation in his records, "BTW=11/17/04," or "back to work" on November 17.

Likewise, Plaintiff went to Rivera with symptoms of abdominal pain, difficulty sleeping, and

chest pain on November 18, and got a note allowing him to return to work on November 22.

Two other doctors also indicated during this time frame that Plesha was able to work:  Dr.

Korman saw Plesha on November 17 and wrote a note allowing him to go to work the next day,

and someone from the Hammond Clinic saw Plesha on November 26 and allowed him to return

---

[3] In any event, it is implausible that Rivera intended in his November certification to certify Plesha for a twelve-week absence starting on July 23; Rivera completed an unrelated benefits form for Plesha on September 21, 2004 indicating that Plesha's condition commenced on July 23 and stating that Plesha could return to work on September 14, 2004.

to work on November 28th.  Thus, while "nothing in the [FMLA] or regulations limits the employee's ability to produce a medical opinion that contradicts a prior negative certification originally provided by the employee," *see Kauffman*, 426 F.3d at 886-87 (citation omitted), here, the medical evidence subsequent to Rivera's certification uniformly *undermines* Plesha's assertion that he had a serious health condition on November 28.  *Compare id.* (employee's certification was sufficient even though doctor only listed the date employee's illness commenced, not its duration; doctor later provided addendum certifying that incapacity had lasted more than three calendar days).  Thus, though it is unclear what Rivera intended by the certification form, there is no way it can be read to make Plesha FMLA-eligible on the dates of the two disciplinary incidents in question.      Beyond the certification, there is no evidence at all that Plaintiff had a qualifying "serious health condition."  Plaintiff does not direct the Court to any period in October or November in which he was incapacitated for "more than three consecutive calendar days."  29 C.F.R. 825.114(a)(2)(i).  Plaintiff argues that Defendant gave Plaintiff "sick days starting July 21, 2003 through October 20, 2003 and from April 8, 2002 until July 12, 2002."  (Opp. at 8.)  Plaintiff argues that "[t]hese large blocks of time clearly represent a period of incapacity for more than three consecutive calendar days." (*Id.* at 8-9.)  This argument is frivolous.  These absences are not supported by any citation to the record.  In any event, they prove nothing since they occurred more than a year before the time period in question.

Nor has Plaintiff shown that he received medical treatment or was incapacitated on October 23 or November 28, such that those incidents could constitute a "subsequent treatment or period of incapacity" relating to some earlier qualifying incapacity.  *Id.*  For example, Plaintiff concedes that he was able to do his job on November 28 despite experiencing some "minor

16

problems." (Def.'s Ex. 1 at 24.) He admits that he did not seek any medical treatment that day, but rather, went home and rested before coming back and working a full double-shift the next day. *See* 29 C.F.R. § 825.114(b) (bed-rest, by itself, does not qualify as a "regimen of continuing treatment"). And even though Plesha admits he was prescribed Xanax at that time (indeed, Dr. Rivera certified that his only ongoing regimen of treatment was prescription medication), he does not recall whether he was actually taking the medicine or not. (*Id*. at 40.) Plaintiff hasn't even shown that the symptoms of nausea and fatigue that he experienced on November 28 were related to the conditions of anxiety and costochondritis that Dr. Rivera set out in the certification. Without that connection, there is no basis for concluding that those symptoms, taken independently, rose to the level of a "serious health condition." *See* 29 C.F.R. § 825.114(c) ("Ordinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine . . . etc, are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave.").

It is apparent from Plaintiff's own FMLA form (Def.'s Ex. 5) and his testimony (Def.'s Ex. 1 at 90) that he wanted intermittent leave so that he could come and go from work as the need arose. Plaintiff states, "[M]y illnesses and my anxiety states aren't predictable, and I don't know when they're going to come upon [sic], and I don't know when I'm going to have them. It's not something I can control. . . . I check [sic] that box because . . . I can't predict an anxiety attack . . . ." (*Id*.) But again, Plaintiff's only medical evidence of a "serious health condition" is Dr. Rivera's certification, and Rivera specifically stated that Plaintiff did not require intermittent leave. (Def.'s Ex. 5.) Given that the certification denies a need for intermittent leave, Plaintiff cannot use Dr. Rivera's certification to support multiple periods of incapacity interspersed with

17

periods when Plaintiff could do his job without any trouble.

Plaintiff had ample time both in the internal grievance process and in this litigation to show that his illness rose to the level of a "serious health condition."  *See Kauffman*, 426 F.3d at 887.  Indeed, Plesha's union representative testified that he had to withdraw the grievance that the union filed on Plesha's behalf because, over the several months that the grievance was pending, Plesha never produced any medical documentation that he was unable to work overtime on November 28.  (Def.'s Ex. 11 at 34-35; Def.'s Ex. 4.)  Having failed to adduce any evidence other than the inadequate certification, Plesha has not created a genuine issue of material fact as to his entitlement to FMLA leave for either the October 23 or November 28 incidents – each of which provided an independent basis for discharge.  Because the FMLA does not protect Plesha from discharge on the basis of those incidents, Plesha's discharge was not unlawful.

## III. CONCLUSION

For the foregoing reasons, Defendant U.S. Steel's motion for summary judgment is **GRANTED**.  The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendant stating that Plaintiff is entitled to no relief.  The clerk shall treat this civil action as **TERMINATED**.  All further settings in this action are hereby **VACATED**.

**SO ORDERED**.

ENTERED:  February 7, 2007

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT